United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 16, 2005**

Charles R. Fulbruge III
Clerk

REVISED FEBRUARY 18, 2005

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-11260

_____

TIMOTHY TYLER TITSWORTH,

Petitioner-Appellant,

versus

DOUG DRETKE, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee.

_____

Appeal from the United States District Court
For the Northern District of Texas

_____

Before HIGGINBOTHAM, DAVIS, and PRADO, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

I

In 1993, a jury in Randall County, Texas, convicted Timothy Titsworth of capital murder of Christine Marie Sossaman by striking her with an ax in the course of a robbery. The Texas Court of Criminal Appeals affirmed the conviction and sentence two years

later in an unpublished opinion.[1]  That court described the crime

as follows:

> [T]he evidence shows [Titsworth] and the victim had been living together for approximately two months when this offense occurred.  A friend of the victim testified that on the day before the victim's murder the victim told her she intended to ask [Titsworth] to move out of the house because the victim believed [Titsworth] was stealing from her.
>
> The next day [Titsworth] killed the victim in her bedroom by striking her with a dull two-bladed ax approximately sixteen times excluding the defensive wounds on the victims [sic] hands and legs.  The victim probably was asleep in bed when the attack began.  At some point during the attack the victim "was either taken off or came off the bed."  The victim suffered at least seven blows from the ax while she was on the floor.  After the attack, [Titsworth] left the victim on the floor.  The medical examiner testified the victim could have lived anywhere from twenty minutes to "a number of hours" after the initial attack.  After she died, the victim suffered at least one more blow from the ax in a separate episode from the initial attack.
>
> After the initial attack, [Titsworth] took the victim's car and some of the victim's personal property. [Titsworth] sold the victim's personal property and used the money to buy crack cocaine.  Over the next couple of days [Titsworth] and other admitted crack cocaine users made a couple of trips to the victim's home and took more of her property.  They used the victim's property to buy more crack cocaine.  One of these witnesses testified [Titsworth] acted like he was "just having a good time."
>
> After [Titsworth] exhausted his supply of money and drugs, he slept for approximately ten or eleven hours. After he awoke, he and another person decided to make another trip to the victim's home in the victim's car to get more of her property.  However, by this time the victim's mother had found the victim's body and had alerted the police who were then looking for [Titsworth]. The police arrested [Titsworth] and another person in the

---

[1] *Titsworth v. State*, No. 71,804 (Tex. Crim. App. Nov. 22, 1995).

2

victim's car while, according to this other person, they were on their way to the victim's home.

Later that day, after initially denying any involvement in the offense, [Titsworth] confessed to killing the victim and taking her property. In his confession, [Titsworth] claimed he and the victim had some type of argument after she accused [Titsworth] of "messing around." After slapping [Titsworth] around, the victim went to bed. [Titsworth] left the house and bought some crack cocaine and a pill he thought was LSD. [Titsworth] ingested the drugs and went back to the house. [Titsworth] retrieved an ax from a closet while the victim was asleep in bed. [Titsworth] claimed he blacked out but he remembered hitting the victim with the ax. He claimed he hit the victim four or five times with the ax. He claimed that when he realized what he had done he did not know what to do so he sold some of the victim's property and bought more crack cocaine. On his first trip back to the victim's home, [Titsworth] claimed the victim "was still breathing and it looked like she had tried to crawl into the bathroom." However, [Titsworth] left the house with more of the victim's property which [Titsworth] sold to buy more crack cocaine. [Titsworth] claimed he was taking a friend home when the police arrested him.

[Titsworth's] theory at trial was that he was not guilty of capital murder because the evidence showed only that he killed the victim under the influence of drugs as a result of a "lover's spat" and not with the intent to take her property.[2]

Titsworth sought state habeas relief in 1997. The state habeas judge, Samuel C. Kiser, also presided over the trial. Judge Kiser found there were no questions of fact and entered findings and conclusions with a recommendation that relief be denied. He did not conduct an evidentiary hearing. The Court of Criminal Appeals adopted his findings and conclusions and denied relief.

---

[2] *Id*. at 1-3.

Titsworth filed a petition for federal habeas relief seeking relief upon eleven grounds. The State makes no contention that any of these federal claims were not first fairly presented to the state courts, except for the claim that Titsworth's confession was involuntary and should have been suppressed because he was intoxicated.[3] United States District Judge Mary Lou Robinson referred the case to Magistrate Judge Clinton E. Averitte. He held an evidentiary hearing limited to portions of the four claims involving the testimony of Deputy Cindy Risley.

Judge Robinson adopted the magistrate's findings and recommendation that the petition and a certificate of appealability be denied. Titsworth in turn seeks a certificate of appealability from this court on nine claims:

1.  Whether Titsworth was deprived of due process and a fair trial because the State failed to disclose favorable and material evidence;

2.  Whether the admission of Titsworth's written statement violated his right to due process because he was intoxicated at the time the statement was taken;

3.  Whether Titsworth's right to due process was violated by the State's allowance of false testimony at trial;

4.  Whether Titsworth was denied effective assistance from trial counsel's failure to

---

[3] The State in footnote 4 of its opposition also does not concede that Cindy Risley's "statement" was exhausted in state court because it was presented in an unsigned affidavit and the court refused to consider it. It was later signed by Risley and presented to the federal district court.

4

adequately investigate and present mitigating evidence;

5.  Whether Titsworth was denied effective assistance from trial counsel's failure to fully investigate and present evidence in support of suppressing Titsworth's written statement;

6.  Whether Titsworth was denied effective assistance from trial counsel's failure to request a copy of a psychiatric report, to object to the State's failure to provide Titsworth with a copy of such report, or to make the sealed report a part of the appellate record;

7.  Whether Titsworth was denied effective assistance from trial counsel's failure to raise in a timely and specific manner, a request for the appointment of a psychiatric expert to assist in Titsworth's defense;

8.  Whether Titsworth was denied due process by the trial court's failure to provide funds for a psychiatrist; and

9.  Whether Titsworth was denied due process by the trial court's order sealing a psychiatric report.

## II

A certificate of appealability is a jurisdictional prerequisite to this appeal.[4] A certificate requires a "substantial showing of the denial of a constitutional right."[5] This showing requires that "reasonable jurists could debate whether (or, for that a matter, agree that)" the district court should have

---

[4] 28 U.S.C. § 2253(c); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

[5] 28 U.S.C. § 2253(c)(2).

5

resolved the claims in a different manner or that this Court should encourage Titsworth to pursue his claims in federal court.[6] Following oral argument, we refused all requests for a certificate of appealability, save one. We advised counsel as follows:

> The court has denied a certificate of appealability on all issues except one. It has granted a certificate of appealability on Titsworth's contention that the State breached its duty under *Brady* in failing to disclose the opinions of Deputy Risley regarding Titsworth's condition when he was booked into jail by her.
>
> If petitioner Titsworth wishes to file a supplemental brief, he may do so within fifteen days. The State may reply ten days thereafter.

With the benefit of this additional briefing, we now explain our denial of a COA and our reason for rejecting on its merits the claim for which we issued a certificate.

## III

### A

Titsworth's first three claims are factually interrelated. They focus upon his intoxication when the murder was committed and when he was taken into custody and interrogated. He asserts that the government withheld evidence of his intoxication that was material both to his contentions about the crime – that it was a lover's quarrel, not a robbery – and to whether his confession was voluntary. Relatedly, he urges that the officer who took his

---

[6] *Dowthitt v. Johnson*, 230 F.3d 733, 740 (5th Cir. 2000) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)) (internal quotation marks omitted).

6

statement, Sergeant B.J. White, knowingly gave false testimony at trial concerning the statement.

1

We turn first to the claim that the prosecution committed a "*Brady* violation" by failing to disclose that a deputy in the Randall County Sheriff's Office had expressed an opinion to co-workers that Titsworth was intoxicated when she booked him into the jail.[7] The law is clear. The Due Process Clause of the Fourteenth Amendment requires prosecutors to disclose to a defendant, on request, any evidence which is favorable and material to the issue of guilt or punishment.[8] Evidence is material if there is a reasonable probability that the result would have been different had it been disclosed to the defendant.[9] A "reasonable probability of a different result" is shown "when the government's evidentiary suppression undermines confidence in the outcome of the trial."[10] This disclosure requirement imposes a "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."[11] A Brady violation entails three components: "The evidence at issue must be favorable

_____

[7] *See Brady v. Maryland*, 373 U.S. 83, 87 (1962).

[8] *Id.* at 87.

[9] *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995).

[10] *Id.* at 434 (internal quotation marks and citation omitted).

[11] *Id.* at 437.

7

to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."[12]

The state trial judge granted the usual *Brady* pre-trial request to order the prosecutor to turn over information favorable to the defense, including information regarding any witnesses who would give favorable testimony. Titsworth made no contention to the state trial judge before his conviction and sentence that the confession was involuntary because he was intoxicated.[13] Rather, his motion to suppress his confession contended that it was a product of an illegal arrest. It was denied. He did rely at trial upon evidence of his intoxication and difficulties with drugs and alcohol, but only in mitigation and in support of his contention that the killing was not a robbery but a lover's quarrel.

Judge Kiser, presiding over the state habeas proceedings, found that the failure to disclose Risley's statement did not violate *Brady*. He filed detailed findings of fact and conclusions of law.

---

[12] *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also Banks v. Dretke*, 540 U.S. 668, 691 (2004).

[13] The attack on the confession based on intoxication came in Titsworth's state habeas petition and later in his federal petition.

Deputy Risley's testimony was presented to Judge Kiser only in an "affidavit" which she had refused to sign. He refused to consider it. He credited the testimony of John Ballard, who was with Titsworth on the day he was arrested and confessed. Judge Kiser found that he "gave uncontradicted testimony that [Titsworth] had slept from ten to eleven hours immediately prior to his arrest. During this time, neither Ballard nor [Titsworth] consumed any drugs or alcohol." Judge Kiser held as an alternative basis for denying relief on this claim that it was barred because it was never raised at trial or on direct appeal.

The federal magistrate in turn rejected the claim after an evidentiary hearing at which he heard the testimony of Risley. At the federal hearing Cindy Risley testified that she was the deputy responsible for booking Titsworth into the Randall County Jail. She testified that Titsworth was under the influence of drugs or alcohol during the hour or so it took to book him into the jail. She also stated that she had told fellow officers of Titsworth's condition at the time of booking, but was told not to say such things. She testified that he was "grinning and laughing" and that he "didn't seem to be aware of the seriousness at the time." According to Risley: "[H]e would laugh, he'd nod off. I had to wake him up a couple of times during the booking process. He didn't seem to understand at the time what he was being brought in for." She recalled that he answered questions as if the victim were still alive.

9

The magistrate judge concluded that there was no *Brady* obligation to produce this evidence because with due diligence it was available to the defense. Specifically, Risley had been listed as a trial witness and was available. She in fact testified in the sentencing phase of the trial. The magistrate further pointed out that, at the evidentiary hearing he conducted, Titsworth did not testify and offered no other evidence regarding his intoxication. The magistrate judge also noted that Titsworth made incriminating statements to persons in addition to Sargent White, who took the confession. Finally, he credited White's testimony regarding Titsworth's interrogation in which he confessed, concluding that White was in a much better position to observe Titsworth's intoxication than Risley.

We were persuaded that a certificate of appealability should issue on the claim that the failure to disclose the statements made by Deputy Risley violated *Brady*. Reasonable jurists may differ over whether the federal district court should have resolved this claim in a different manner insofar as it rested on the view that there was no breach of duty to disclose Risley's comments to her co-workers because the defendant with due diligence could have learned of them. The principle that there is no duty to produce, evidence equally available to the prosecution and defense is sound but is pushed too far on these facts. The prosecutors had been ordered to produce information favorable to the defense and assured

10

counsel that they had done so. While we granted a certificate of appealability on this issue, with the benefit of full briefing and oral argument, we are persuaded that the claim is ultimately without merit in that the evidence is not material. The judgment of the district court denying relief on this claim must be affirmed.

Titsworth made no claim to the trial court or the Texas Court of Criminal Appeals on direct appeal that his confession was involuntary because his free will was lost to alcohol and drugs. Judge Kiser found that the claim is procedurally barred, and that finding was adopted by the Court of Criminal Appeals and the federal magistrate in turn.

This independent state ground for barring Titsworth's *Brady* claim does not end the matter. It is suggested that various comments made to Risley by fellow officers, such as reminding her that she is an at-will employee and she should not be making comments like that, constitute good cause for excusing this procedural default. When Titsworth finally raised the *Brady* issue in his state habeas proceeding, his submission did not include Risley's testimony. Only her unsigned affidavit was offered to Judge Kiser.[14] Not surprisingly, he refused to consider it and neither side had otherwise secured her testimony.

---

[14] We do not pause over the question of whether this claim was fairly developed in the state habeas hearing since we ultimately reject it on the merits.

Risley's sworn testimony as to Titsworth's condition at the time of booking was not taken until the hearing before the federal magistrate. He credited her testimony that she always felt free to express her opinion in open court and had told co-workers as much. Risley testified that she would have cooperated with defense counsel and testified truthfully at trial if asked to do so. Both the former district attorney and County Sheriff testified that they would not have prevented anyone with evidence from coming forward. We are offered no basis for ignoring these fact findings and reaching a contrary conclusion. Regardless, even if the various comments made to Deputy Risley did frustrate the defendant's access to the evidence and excuse the procedural default, we need not rest there. The claim also fails on its merits. That is, assuming the defendant has opened a road, it leads nowhere now because it would have led nowhere then.

The argument is that had Risley's comments been disclosed to defense counsel, he could have attacked the confession as involuntary and further used her testimony both to support the defensive theory of "lover's spat, not a robbery" as well as in mitigation. This contention is as unpersuasive to us as it was to Titsworth's trial counsel. As the magistrate judge pointed out, Deputy Risley was listed as a trial witness. While it was a very long list of witnesses the prosecution handed to court-appointed counsel, Deputy Risley's name was hardly lost in the crowd as unknown. The defense knew that she was the booking officer and

12

that she had befriended Titsworth. Photographs of Titsworth being booked were received into evidence reflecting behavior seemingly inappropriate to the occasion, such as his laughing and smiling. The level of detail in the confession itself disclosed his significant capacity for recall. Trial counsel Selden Hale explained that "[Titsworth] remembered what he told the police officer and [intoxication] didn't seem to me at the time to be an issue." Co-counsel Joe Marr Wilson also explained that Risley's opinion would not have changed the Judge's ruling on the confession. Moreover, he pointed out that Risley could have been a *harmful* witness in the guilt phase, presumably by testifying - as she later did in the sentencing phase - about an escape by Titsworth with three other jail inmates, at least two of whom were also charged with capital crimes. Significantly, she also could have testified that Titsworth confessed to her some time after he had been in jail. In any case, there were less risky ways of developing Titsworth's difficulties with drugs and alcohol, as the trial reflects.

Furthermore, the State offered evidence that Titsworth admitted the crime both to Jean Roper, his longtime probation officer, when she visited him in jail, and to Risley when she was making jail rounds. Attacking the formal confession as being involuntary under these circumstances was not a realistic course of action. In addition, while it was arguably relevant evidence of

13

intoxication in support of the lover's spat theory and in mitigation, it was at best cumulative.

Even so, when shown a picture of Titsworth taken while he was being booked, Jean Roper, having recounted Titsworth's long difficulties with addiction and repeated failure in treatment, observed that he was probably still high. It is true that had the disclosure been made, defense counsel could have cross-examined Deputy Risley about her opinion of Titsworth's condition during booking to counter the State's suggestion that photographs of Titsworth being booked showed his lack of remorse. But her opinion would have been in the teeth of Sergeant B.J. White's and John Ballard's testimony that Titsworth had just slept eleven hours prior to being arrested while at a store to buy a soft drink. The defense focused on his mental state at the time of the murder. If he was still under the effects of the drug spree when he was interrogated, as Risley would opine, it was powerful evidence cutting against the claim for his mental state during the murder. For example, he recalled events of the binge in detail and even assembled electronic components, as Ballard had recounted.

The sum of this is that failure to disclose Deputy Risley's comments did not undermine confidence in the outcome of the trial. The defense could do little with her testimony, as we have explained. Overarching all of this is the reality that the argument to "please understand that while I took an ax to my

14

girlfriend, I had a problem with drugs and alcohol," without more is a hard sell.

2

Titsworth also asserts a *Brady* violation by pointing to the prosecutor's failure to disclose a memorandum in his file regarding a conversation with Ron Kelly, a Methodist minister and school administrator. Kelly purportedly disclosed to the State that Titsworth had confided to him that when under the influence of alcohol or drugs, he was not very aware of anything. In an affidavit, presumably given to state detectives, Kelly also expressed the opinion that when drugs were involved Titsworth could not control himself or distinguish right from wrong. The magistrate judge observed that this evidence was hearsay and would not have been admissible, and that Kelly was not competent to express the opinion. The judge also noted that it was not clear that the prosecutor had a *Brady* duty to disclose inadmissible evidence, but did not rest there. He ultimately concluded that nondisclosure of Kelly's opinions regarding Titsworth's cognitive levels when drunk was not material because voluntary intoxication is not a defense to the crime, and the evidence was relevant only in mitigation. He pointed out that there was an abundance of evidence in mitigation regarding alcohol and drugs and therefore the Kelly evidence would have been cumulative. Because the lack of materiality is not debatable by reasonable jurists, we conclude

15

that the requisites for a certificate of appealability have not been met with this claim.

3

In Claim Two, Titsworth urges that his written confession was involuntary because he was drunk. Relatedly, in Claim Three, he urges that the State's evidence that his confession was freely and voluntarily given was false.

The magistrate judge held that there was no evidence that Sergeant White had committed perjury, finding White's testimony before him to be credible. With this, he concluded, the first element of a *Giglio* claim, falsity, was missing, as well as the third element that the prosecution knew the testimony was false.[15] We are offered no reason to disregard this credibility call.

That the district court should have resolved Claims Two and Three in a different manner or that we should encourage further prosecution of the claims in federal court is not debatable among reasonable jurists.[16] In the prosecution of these two claims, there has been no substantial showing of the denial of a constitutional right.

B

---

[15] *See Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000).

[16] We discuss further the voluntariness of Titsworth's confession in connection with Claim Five. *See infra* Part III.B.2.

We turn next to the claims of ineffective assistance of counsel: Claims Four through Seven. These claims are measured by the two-prong test of *Strickland*: deficient performance and prejudice.[17] A deficient performance is conduct beyond the bounds of prevailing, objective professional standards.[18] We are to accord substantial deference to counsel's performance, applying the strong presumption that counsel performed adequately and exercised reasonable professional judgment.[19] Prejudice is shown by a demonstration that there is a "reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different."[20]

1

In Claim Four, Titsworth asserts that counsel was ineffective in failing to adequately investigate and present mitigating evidence. We declined to issue a certificate of appealability on this claim. Titsworth's drug addiction and his difficult upbringing were the centerpieces of his case in the sentencing phase of the trial. William Schlitz was the first witness for the

---

[17] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[18] *Id.* at 687-88; *Roberts v. Dretke*, 381 F.3d 491, 498 (5th Cir. 2004).

[19] *Strickland*, 466 U.S. at 689; *Riley v. Dretke*, 362 F.3d 302, 305 (5th Cir. 2004).

[20] *Williams v. Taylor*, 529 U.S. 362, 391 (2000) (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

17

defense. This former addict, now working with prisoners having histories of addiction, explained at length the addictive force of crack cocaine and its effects on the mind. His testimony was graphic and presented Titsworth's difficulty in vivid terms. It was testimony about the real world of the addict, including the difficulties of extricating oneself from the grip of crack cocaine and the overpowering need to obtain more drugs, the entry gate to thefts, robberies and burglaries.[21] After this witness, the defense offered the testimony of Thomas W. Hale, Ph.D., a distinguished scholar and professor. He explained the chemistry of drugs and the effects of cocaine and crack cocaine, adding technical reenforcement to Schlitz's testimony.

Titsworth's mother, Elsie May Titsworth, then testified, detailing her own troubles with alcohol and the difficulties faced by Titsworth in his youth. She recounted that he was conceived during a time when she worked as a bartender, but that Tex Titsworth, her husband, was not his father. She told the jury that her husband resented Titsworth because he was not his son. He persisted in calling him a "fat little Mexican." She explained that defendant's biological father, Aragon, showed interest in his

---

[21] Cross examination by the State supports the defense counsel's lack of interest in pursuing a theory that the confession was involuntary. Schlitz readily conceded that while high he would never have been able to produce either a written or oral confession. Of course, Titsworth did offer details of the crime and confessed it to two other persons on different occasions.

18

son but died when Titsworth was four and one-half years old. Aragon had reunited with his wife but, on the first day of that reunion, he murdered her and subsequently took his own life. There were dozens of moves from town to town until the State of Wyoming took the children, including Titsworth, then nine years old, and put them in an orphanage. She testified about the abuse Titsworth suffered in state custody until the children were returned about 18 months later.

Any suggestion that counsel was ineffective by failing to call Deputy Risley is without merit. As we have explained, Deputy Risley did testify, but in the sentencing phase as a *State* witness recounting Titsworth's later admission of guilt and subsequent jail escape. The strategy pursued by defense counsel cannot now be faulted, given the panoply of facts that they could not with credibility seriously contest.

In sum, a reading of the trial transcript belies the assertion that counsel was ineffective in investigating and presenting evidence of mitigation in the sentencing phase. For these reasons, we denied the request to issue a certificate of appealability on this claim.

2

In Claim Five, Titsworth urges that his counsel was ineffective in not fully investigating and presenting evidence in support of his motion to suppress his confession. We were not

19

persuaded that counsel's performance was deficient and declined to issue a certificate of appealability on this claim. The want of merit in this claim is evident in our discussion and rejection of the first four claims.

As we have recounted, the State produced John Ballard who testified at length in the guilt phase. Ballard detailed the events of the two days preceding Titsworth's arrest. He told the jury that he accompanied Titsworth on two trips to the trailer where the victim's body lay, although he apparently did not know then of the killing or see her body. On the first trip he helped Titsworth remove and sell an expensive television. They then purchased and smoked crack with the $100 they had received. After exhausting these funds, they returned and removed an expensive stereo set and sold it. Again they purchased crack cocaine. When finally the money was gone and the dope was smoked, they slept for eleven hours. On awakening, they left the house they were in and were quickly arrested – the body having been found by the victim's mother in the meantime.

Judge Kiser credited this testimony in the state habeas proceeding, rejecting the contention that the confession was involuntary because Titsworth was high on drugs. He pointed to the fact that Titsworth was sober when arrested, having slept for eleven hours and then gone to the store for a Coke. This fact and the detailed description of their drug spree posed a formidable obstacle to any assertion that Titsworth's drug use resulted in an

20

involuntary confession to Sergeant White.  Titsworth was able to retrieve property and effect its sale on two occasions.  He also had to connect and program the TV setup for the purchaser and show the buyer how to operate the remote control – all during this drug spree.  The testimony of the defense's own witness in the penalty phase, Schlitz, who offered a vivid description of the grasp of crack cocaine, was at odds with any suggestion that Titsworth was so intoxicated as to render his confession involuntary.  Furthermore, Titsworth's later admissions of guilt to his probation officer on one occasion and to Deputy Risley on another would also need explanation if the statement taken by Sergeant White were to be challenged as involuntary.  In sum, Counsel's course of action was then and now with hindsight a rational path.  Having read the trial transcript and heard oral argument, we concluded that Titsworth was well defended by counsel who had little to work with.

3

In Claims Six and Seven, Titsworth asserted ineffective assistance in counsel's failure to obtain a copy of psychiatric reports or to request an independent psychological evaluation.  Before the state trial, the trial judge ordered that Titsworth be given a psychiatric examination to determine competency.  The resulting report of Dr. Shaw found that Titsworth was competent and that his behavior at the time of the offense was consistent with someone under the influence of alcohol and drugs.  Trial counsel did not request a copy of the report.  The magistrate judge pointed

21

out that the state habeas judge had found that the testimony of Dr. Shaw would only have been cumulative. The magistrate then rejected the claim. On the basis of the state court record, the magistrate judge concluded that counsel's request for an expert was denied by the state trial court and that Titsworth's trial lawyer in any event obtained voluntary expert assistance in presenting his mitigation evidence. We agreed and were not persuaded to issue a certificate of appealability on these claims.

C

In Claims Eight and Nine, Titsworth argues the trial court denied him due process by not providing funds for a psychiatrist and by sealing a psychiatric report. We refused a certificate of appealability on this claim for essentially the reasons stated by the magistrate judge.

IV

We have denied the request for a certificate of appealability for all claims except the claim that the prosecution failed to discharge its *Brady* duty by not disclosing comments made by Deputy Risley to her co-workers, a claim we now reject on its merits.

AFFIRMED.