# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 14, 2011

Lyle W. Cayce
Clerk

No. 10-70007

GEORGE RIVAS,

Petitioner–Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent–Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:06-CV-344

Before GARZA, CLEMENT, and OWEN, Circuit Judges.

PER CURIAM:[*]

Petitioner George Rivas, convicted of capital murder in Texas and sentenced to death, requests a Certificate of Appealability (COA) to appeal the district court's denial of his petition for a writ of habeas corpus. Because Rivas has not made a substantial showing of the denial of a constitutional right or otherwise met the qualifications for his application, his request for a COA is DENIED.

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**I**[1]

On December 13, 2000, Rivas and six of his fellow inmates escaped from the Connally Prison Unit of the Texas Department of Criminal Justice. The group, later known as the "Texas Seven," included Rivas, Joseph Garcia, Randy Halprin, Larry Harper, Patrick Murphy, Donald Newbury, and Michael Rodriguez.

Eleven days after their escape, the Texas Seven initiated a Christmas Eve robbery of the Oshman's Superstore in Irving, Texas, that ended with the death of Irving police officer Aubrey Hawkins. Armed with weapons and two-way radios, Garcia, Halprin, Newbury, and Rodriguez entered the store just prior to closing pretending to be customers, while Rivas and Harper masqueraded as Oshman's security guards. Murphy, the seventh member of the group, waited in a truck outside the store, serving as a lookout and checking police radio frequencies. Rivas and Harper explained to the store managers that they were investigating a theft at another Oshman's and asked that a manager bring the store's employees together to look at a photo spread. Meanwhile, the other men moved throughout the store collecting merchandise. Once the employees were gathered together, Rivas brandished a gun and told everyone of his intent to rob the store. Rivas then instructed the men in his group to take the Oshman's employees to the store's breakroom and tie them up. While this was happening, Rivas told store manager Wesley Ferris to open the store's gun vault, safe, and cash registers. Rivas repeatedly warned Ferris not to try anything or he and the others would be shot. Afterwards, Rivas left Ferris with the employees in the breakroom, took Ferris's car keys, exited the Oshman's through the main front entrance, and drove Ferris's Ford Explorer around the store to the loading dock located in the back.

---

[1] The following factual and procedural history is taken substantially verbatim from the magistrate judge's findings and recommendations. *See Rivas v. Thaler*, No. 3:06-CV-344-B, 2010 WL 1223130 (N.D. Tex. Jan. 22, 2010).

Altogether, the Texas Seven stole over $70,000 in cash, forty-four firearms, ammunition, and other goods from the store, in addition to the employees' jewelry and wallets.

During the robbery, Misty Wright, a girlfriend of one of the Oshman's employees, waited in her car outside the store and saw the employees inside raising their hands over their heads. Wright called a friend who joined her in her car. The two saw Rivas exit the Oshman's and drive Ferris's Ford Explorer to the back of the store. Wright and her friend then fled the parking lot and called the police from a nearby restaurant. Rivas, who had seen Wright and her friend driving away in haste, used his two-way radio to warn the others, and he directed them to get to the back of the store. Within minutes, Murphy radioed the group, alerting them to a police vehicle he had seen entering the Oshman's parking lot.

The police dispatcher who took Wright's emergency call sent four officers to the scene. Irving police officer Aubrey Hawkins was the first to arrive. Hawkins drove directly through the parking lot to the back of the store, where he was shot eleven times by various members of the Texas Seven. Evidence at trial established that at least five different guns fired at Hawkins from at least three directions in less than a minute and that he died immediately. Some of the escapees pulled Hawkins from the police vehicle and took his sidearm. Moments later, Rivas ran over Hawkins in the Ford Explorer, dragging his body approximately ten feet. According to Rivas, he did not know he had run over Hawkins until he heard the evidence at trial.

During his trial, Rivas testified that as he approached Hawkins's vehicle, he thought he saw the officer reaching for his gun and that he [Rivas] only shot Hawkins in an attempt to subdue him. Rivas claimed that he purposefully shot the officer in the chest because he knew Hawkins would be wearing a bulletproof vest. In addition, Rivas said that he shot at Hawkins four times in response to

what he thought were shots fired by Hawkins. The evidence showed that Rivas was, in fact, shot during the period of intense gunfire.

Following the robbery, the Texas Seven escaped to Colorado where someone identified them and notified the Federal Bureau of Investigation. All of the men were arrested, except Harper, who committed suicide before authorities could apprehend him. On the day of his arrest, Rivas was interviewed by police and, after waiving his *Miranda* rights, signed a 21-page written confession. During searches of an RV and another vehicle the Texas Seven had been using, authorities recovered Hawkins's gun, as well as guns and merchandise stolen from the Oshman's in Irving, Texas.

Following the close of the evidence at trial, a Dallas County jury convicted Rivas of capital murder. *See* TEX. PENAL CODE ANN. § 19.03.

The evidence presented during the punishment phase of Rivas's trial established the following: Rivas was serving seventeen life sentences, some concurrent, when he escaped from prison. Rivas had prior convictions for aggravated kidnapping, burglary, and aggravated robbery of an Oshman's in El Paso, Texas. Evidence from both the State and the defense showed that Rivas was the ringleader of the Texas Seven, and that he had planned their escape from the Connally Unit, as well as the robbery of the Oshman's in Irving. The State introduced evidence showing that Rivas and the other escapees assaulted and threatened prison employees during their escape. And, after the escape, Rivas planned and led three other robberies before eventually targeting the Oshman's in Irving. In addition, the State elicited testimony from Rivas's half-sister, who claimed that Rivas had sexually abused her from the age of six through sixteen. Finally, the State presented expert testimony from a criminal forensic psychiatrist who testified that based on his review of Rivas's history, it was his opinion that Rivas would probably commit criminal acts of violence in the future and continue to threaten society.

Rivas testified during sentencing and admitted to committing numerous crimes, as well as to planing the group's escape from prison and the robbery of the Oshman's in Irving.  In his defense, Rivas told the jury that he tried to be polite and minimize the pain he inflicted on others during his crimes.  Rivas also said that he did not intend to kill officer Hawkins, nor that he had planned to commit additional robberies.  Rivas denied his half-sister's allegations of abuse.  Ultimately, Rivas told the jury that he would rather die than be sent back to prison.

After the jury answered the special issues set forth in TEX. CODE CRIM. PROC. ANN. art. 37.071, the state trial court set Rivas's punishment at death by lethal injection.

The Texas Court of Criminal Appeals affirmed Rivas's conviction and sentence on direct appeal, *Rivas v. State*, No. 74,143 (Tex. Crim. App. June 23, 2004) (unpublished), and the Supreme Court denied certiorari, *Rivas v. Texas*, 543 U.S. 1166 (2005).  Rivas also filed a state petition for habeas corpus while his direct appeal was pending.  The state trial court held an evidentiary hearing, entered findings of fact and conclusions of law, and recommended that the petition be denied.  The Texas Court of Criminal Appeals adopted the trial court's findings and denied relief.  *Ex parte Rivas*, No. WR-63,286-01, 2006 WL 367474 (Tex. Crim. App. Feb. 15, 2006) (per curiam).

Rivas next filed a federal habeas petition in the Northern District of Texas, alleging nine grounds for relief.  In addition, Rivas filed a separate brief—over eleven months after filing his original habeas petition and without leave of court—in which he argued that 28 U.S.C. § 2254 violates the Separation of Powers doctrine.  The matter was initially referred to a magistrate judge who entered detailed findings and conclusions, and recommended denying relief on all grounds, including Rivas's Separation of Powers claim.  *Rivas v. Thaler*, No. 3:06-CV-344-B, 2010 WL 1223130 (N.D. Tex. Jan. 22, 2010).  The district court adopted the magistrate's findings and recommendations, with minor corrections,

and denied a COA on all claims. *Rivas v. Thaler*, No. 3:06-CV-344-B, 2010 WL 1223132 (N.D. Tex. Mar. 29, 2010). Rivas now requests a COA from this court on the nine issues raised below, as well as on his Separation of Powers claim.

## II

Because Rivas filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), his petition is governed by the procedures and standards provided therein. *See Parr v. Quarterman*, 472 F.3d 245, 251–52 (5th Cir. 2006). Under AEDPA, a petitioner must obtain a COA before appealing the district court's denial of habeas relief. *See* 28 U.S.C. § 2253(c). This is a jurisdictional prerequisite. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) ("[U]ntil a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners.").

A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327 (citation omitted). "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Id.* at 342. "Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. "While the nature of a capital case is not of itself sufficient to warrant the issuance of a COA, in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." *Johnson v. Quarterman*, 483 F.3d 278, 285 (5th Cir. 2007) (citing *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005)).

We also recognize that the district court evaluated Rivas's claims under AEDPA's deferential framework. Under AEDPA, a federal court cannot grant

habeas relief on any claim adjudicated on the merits by a state court unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (quoting 28 U.S.C. § 2254(d)(1) and (2)). A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 404–08 (2000). A state court's decision constitutes an unreasonable application of clearly established federal law if it is "objectively unreasonable." *Id.* at 409; *see also Schriro v. Landrigan,* 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."). In addition, under § 2254(e)(1), the state court's findings of fact are presumed to be correct unless rebutted by clear and convincing evidence. *Id.* at 473–74; *see also Wood v. Allen*, 130 S. Ct. 841, 847 (2010).

### III

Rivas requests a COA on ten issues: (1) whether trial counsel rendered ineffective assistance by failing to object to an improper closing argument by the prosecutor; (2) whether trial counsel rendered ineffective assistance by failing to make a "fair cross-section" objection to the jury pool; (3) whether trial counsel rendered ineffective assistance by failing to object to the prosecutor's use of out-of-court statements by Rivas's co-defendants at the punishment phase of trial; (4) whether the trial court erroneously admitted expert testimony on sentencing regarding future dangerousness; (5) whether Texas's lethal injection protocol violates the Eighth Amendment; (6) whether Rivas's due process rights were

violated by the trial court's failure to instruct the jury on the burden of proof regarding the mitigating factors contained in the jury charge; (7) whether the trial court's jury instructions used terms that were unconstitutionally vague and undefined; (8) whether Texas's death penalty statute, which does not require that the jury be instructed on the consequences of its failure to agree on a punishment phase special issue, is unconstitutional; (9) whether the trial court erred in instructing the jury in sentencing that it was not to consider how long Rivas might serve in prison if sentenced to life; and (10) whether 28 U.S.C. § 2254 violates the Separation of Powers doctrine. Of the ten issues presented, Rivas acknowledges that five are expressly foreclosed by either Supreme Court or this court's precedents, or both. We address each issue in turn.

## A

Rivas first claims that his trial counsel rendered constitutionally ineffective assistance at trial when he failed to object to the prosecutor's closing argument.

We evaluate this claim, and the two ineffective assistance claims that follow, under the familiar standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail, Rivas must show by a preponderance of the evidence that his attorney's performance was deficient and that the deficient performance prejudiced his defense. *Id.* at 687. In assessing trial counsel's performance, we give deference to the strategic decisions made by counsel, applying the strong presumption that counsel's performance "falls within the wide range of reasonable professional assistance." *Id.* at 689. In doing so, we evaluate trial counsel's conduct from counsel's perspective at the time of trial, endeavoring to "eliminate the distorting effects of hindsight." *Id.* To show prejudice, Rivas must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "Reasonable probability" is defined as a probability sufficient to undermine confidence in the outcome. *Id.* Ultimately, *Strickland*'s prejudice

inquiry focuses on whether counsel's deficient performance "renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams*, 529 U.S. at 393 n.17.     And unless Rivas makes both showings under *Strickland*—deficient performance and prejudice—it cannot be said that his conviction or death sentence "resulted from a breakdown in the adversary process that renders the result unreliable" and requires reversal. *Strickland*, 466 U.S. at 687.

Rivas claims that the prosecutor's summation was improper because the prosecutor did not discuss the specific intent required of Rivas's *co-conspirators* in causing Hawkins's death.  Rivas contends that this omission was contrary to the law contained in the jury instructions and "invited the jury to engage in jury nullification." Pet. Br. at 8.  Rivas takes issue with the following portion of the prosecutor's argument, specifically, those parts in bold:

> The evidence in this case is overwhelming.  It is a case which you—it has been explained to you that the State can prove one of two ways, or both, and I submit to you that we have done both.  We can prove to you that [Rivas] intentionally killed Aubrey Hawkins because he was a police officer and he knew that.  We can prove to you that he killed Aubrey Hawkins because he murdered him in the course of a robbery.  **Or we can prove to you that he entered into this conspiracy, and even if he didn't have the intent—let's just take for a moment that ludicrous explanation in his confession that he didn't have the intent to kill anyone out there.  If you agree with that, he is still guilty under the law because he entered into a conspiracy to commit robbery and he should have anticipated that someone would die.**  And this is a plan destined to fail, folks.

According to Rivas, the State did not establish beyond a reasonable doubt that either Rivas or any of his co-conspirators shot at Hawkins with the specific intent to cause his death.  The State erred, Rivas contends, in failing to explain the specific intent requirement to the jury, and Rivas's counsel was therefore ineffective for failing to object to the prosecutor's argument containing the alleged omission.

The trial court correctly instructed the jury that the State could prove Rivas's guilt by proving either: (1) that Rivas murdered Hawkins with knowledge that Hawkins was a police officer, or (2) that Rivas entered into a conspiracy to commit robbery and that one of Rivas's co-conspirators intentionally and knowingly killed Hawkins in furtherance of that conspiracy. *See* TEX. PENAL CODE ANN. §§ 7.02(b), 19.03. In addition, a second prosecutor explained to the jury that the co-conspirator who actually killed Hawkins had to have acted intentionally and knowingly.

The crux of Rivas's claim is that the prosecutor misstated the law in his closing argument to the jury, and that his trial counsel was ineffective for failing to object. The state habeas court rejected this claim, finding that the prosecutor did not misstate Texas law governing the culpability of party conspirators. The court found that Rivas had misinterpreted the prosecutor's argument, and that the argument was not improper because the prosecutor was "simply focusing on [Rivas's] mental state" at the time.[2] The court found in addition that Rivas's trial counsel was making a strategic decision in not objecting to the prosecutor's argument and noted that trial counsel's informed strategic decisions rarely constitute grounds for an ineffective assistance of counsel claim. The court concluded that Rivas's trial counsel was not deficient for failing to proffer what would have been a meritless objection. *See Turner v. Quarterman*, 481 F.3d 292,

---

[2] The state habeas court found, in pertinent part, that:

252.    . . . the prosecutor did not discuss what mental state the co-conspirator who actually killed Officer Hawkins had to possess, but this admission [sic] did not render his argument improper. The Court finds that at this point in the argument, the prosecutor was simply focusing on [Rivas's] mental state, rather than his co-conspirators; thus, the omission was not noteworthy.

253.    Moreover, the Court finds that the argument's silence on the matter of the killing co-conspirator's mental state does not, in itself, convey the message that proof of an intentional or knowing killing was not a prerequisite to [Rivas's] conviction for capital murder. And, the Court finds that such an inference would be illogical.

298 (5th Cir. 2007); *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) ("[F]ailure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness.").

The state habeas court alternatively addressed prejudice under *Strickland*'s second prong, and found that Rivas's claim failed in that regard as well. It is well settled that jurors are presumed to follow the trial court's instructions. *See, e.g., Galvan v. Cockrell*, 293 F.3d 760, 765 (5th Cir. 2002). In light of the trial court's correct instructions to the jury, *see* TEX. PENAL CODE ANN. § 7.02(b), the state habeas court found that Rivas had failed to "rebut the presumption that counsel's decision not to object was a sound one, much less demonstrate how he was prejudiced by it."

Rivas has not demonstrated that an objection to the prosecutor's closing argument would have been meritorious had it been made. As such, Rivas's trial counsel cannot have rendered ineffective assistance by failing to object. Because this claim fails under *Strickland*'s first prong, we need not consider prejudice under *Strickland*'s second prong. Rivas has not made a substantial showing of the denial of a constitutional right. We deny his request for a COA on this issue accordingly.

**B**

Next, Rivas contends that his trial counsel rendered ineffective assistance by failing to make a "fair cross-section" objection to the jury pool. Specifically, Rivas claims that Dallas County's method of convening jury panels results in a systematic exclusion of Hispanics and young adults (i.e., persons 18–34 years old), and that counsel failed to protect Rivas's Sixth and Fourteenth Amendment rights to have a fair cross-section of the community on the panel from which his jury was chosen. We must first determine whether Rivas's fair cross-section claim has merit, since it would not be deficient for counsel to withhold a meritless objection. *See Turner*, 481 F.3d at 298; *Green*, 160 F.3d at 1037.

11

To establish a prima facie fair cross-section claim, Rivas must make three showings. First, he must demonstrate "that the group alleged to be excluded is a 'distinctive' group in the community." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). Second, he must establish "that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." *Id.* Finally, he must show "that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id.* If Rivas fails to demonstrate any of these elements, he has failed to show a constitutional violation. *See Timmel v. Phillips*, 799 F.2d 1083, 1086 (5th Cir. 1986).

The state habeas court found that although Hispanics qualify as a distinctive group in Dallas County, persons 18 to 34—or persons of any particular age group—do not qualify as a "distinctive group" for *Duren* purposes.[3] The district court set this issue aside, finding that Rivas's claim relating to both groups failed under *Duren*'s third prong. We begin our analysis there.

The state habeas court analyzed *Duren*'s "systematic exclusion" requirement and found that Rivas failed to show an underrepresentation of either Hispanics or persons 18 to 34 that was inherent in Dallas County's jury selection process. *See Duren*, 439 U.S. at 366. As the state habeas court and the district court correctly observed, Rivas has not alleged any underrepresentation in the percentage of individuals in these groups who were *called* for jury service.

---

[3] In reaching this conclusion, the state habeas court relied on *Weaver v. State*, 823 S.W.2d 371, 373 (Tex. App.—Dallas 1992). We note that several federal circuit courts have also considered this issue and found that persons between the ages of 18 and 34 do not constitute a recognizable, distinct class under *Duren*. *See, e.g., Johnson v. McCaughtry*, 92 F.3d 585, 590–93 (7th Cir. 1996); *Wysinger v. Davis*, 886 F.2d 295, 296 (11th Cir. 1989); *Ford v. Seabold*, 841 F.2d 677, 681–82 (6th Cir. 1988); *Barber v. Ponte*, 772 F.2d 982, 996–1000 (1st Cir. 1985); *United States v. Kuhn*, 441 F.2d 179, 181 (5th Cir. 1971). Because we find that Rivas's claim fails under *Duren*'s third prong (i.e., the "systematic exclusion" requirement), we need not address whether persons 18–34 constitute a "distinct group" under *Duren*'s first prong.

Rather, the crux of Rivas's claim is that the percentage of individuals in these two groups who actually *appeared* for jury service was significantly less than the percentage of such individuals in Dallas County at the time. Rivas contends that low juror pay and Dallas County's lack of enforcement of its summonses is to blame for the disparate turnout. But the fact that certain groups of persons called for jury service appear in numbers unequal to their proportionate representation in the community does not support Rivas's allegation that Dallas County systematically excludes them in its jury selection process. Such an occurrence does not constitute the type of affirmative barrier to selection for jury service that is the hallmark of a Sixth Amendment violation. *See Taylor v. Louisiana*, 419 U.S. 522, 531 (1975) (holding unconstitutional a state statute that excluded women from jury service unless they had previously filed written declaration indicating their desire to serve).

Rivas urges that a defendant need not show purposeful discrimination to make out a fair cross-section claim, and argues, instead, that systematic exclusion can be proven through any jury selection process that has the net effect of yielding a venire that fails to reasonably represent the community. *See* Pet. Br. at 11 ("[I]f the state's duty is to mean anything, it must mean at a minimum that it cannot stand by and suffer significant racial groups to ignore their jury summonses, if such inaction has the result, as it did here, of dramatically skewing the venire's racial makeup."). Here, Rivas points to Dallas County's low juror pay and inconsistent enforcement of jury summonses as evidence of systemic exclusion of Hispanics and young adults from participation in jury service. But whether a showing of economic discrimination would be sufficient to establish a prima facie *Duren* violation is an issue that the Supreme Court has expressly reserved. *See Castaneda v. Partida*, 430 U.S. 482, 491 n.11 (1977). As such, to grant Rivas relief would require us to announce and apply a new constitutional rule of criminal procedure, which we are prohibited from

doing on federal habeas review. *See Teague v. Lane*, 489 U.S. 288, 310–13 (1989); *Peterson v. Cain*, 302 F.3d 508, 511 (5th Cir. 2002).

Rivas has not shown that any underrepresentation of Hispanics or persons 18 to 34 on his jury venire was due to their "systematic exclusion in [Dallas County's] jury-selection process." *Duren*, 439 U.S. at 366. Thus, he has failed to establish a prima facie violation of the fair cross-section requirement. *Id.* at 364. Since Rivas's allegations evince no *Duren* violation, there could be no ineffective assistance for trial counsel's failure to raise the *Duren* claim. *See Turner*, 481 F.3d at 298. We deny Rivas's request for a COA on this issue.

## C

Rivas's third, and final, ineffective assistance of counsel claim alleges that trial counsel rendered ineffective assistance during the punishment phase of trial when he failed to object to the prosecutor's use of out-of-court statements made by Rivas's co-defendants. During sentencing, the prosecutor read parts of Halpern's, Rodriguez's, and Murphy's statements to Rivas on cross-examination, trying to impeach Rivas's claim that he did not intend to kill Officer Hawkins. Rivas maintains that these out-of-court statements were inadmissible hearsay and used in violation of his Confrontation Clause rights. *See* U.S. CONST. amend VI; *Crawford v. Washington*, 541 U.S. 36, 54 (2004). Thus, Rivas claims, trial counsel's decision not to object to the prosecutor's improper use of these statements could not amount to reasonable trial strategy and was constitutionally ineffective.

Although counsel's alleged ineffectiveness occurred during the punishment phase, *Strickland* remains the governing standard. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003). In addition, where the prejudice inquiry takes place in the context of a capital-sentencing hearing, the relevant question is whether "there is a reasonable probability that, absent the errors, the [sentencing authority] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

In rejecting Rivas's claim, the state habeas court credited trial counsel's testimony that it was his strategy to object as little as possible on cross-examination in order to appear open and honest with the jury. At the state writ hearing, Rivas's trial counsel explained, in pertinent part, that:

> We felt it was critical that the jury feel like we were being above board and open with them and that, therefore, if we started objecting to a lot of things, then we felt we would lose that impact and that effect.

> And we thought that the only chance we had of having one juror hold out against the death penalty was to have someone on the jury, or maybe more than one, you know, convinced that we were—we were shooting straight and weren't trying to hide the ball.

Moreover, trial counsel explained that he thought Rivas's testimony before the jury was one of the defense's strengths and that Rivas was doing a better job parrying the prosecutor's cross-examination than would have been served by objecting. The state habeas court found that even assuming the prosecutor's use of the co-defendants disputed statements was objectionable, Rivas's trial counsel made a reasonable, strategic decision not to object to this evidence, and that that decision constituted a valid trial strategy. The district court likewise found that trial counsel's decision was based on a reasonable trial strategy and did not constitute deficient performance under *Strickland*'s first prong. *See generally Cotton v. Cockrell*, 343 F.3d 746, 752–53 (5th Cir. 2003) ("'A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'") (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)). We do not believe this decision to be debatable. Accordingly, we need not consider the district court's determination that Rivas failed to demonstrate prejudice under *Strickland*'s second prong. We deny a COA on this issue.

**D**

In his next claim for relief, Rivas contends that the trial court violated his due process rights by admitting improper expert testimony during sentencing from the State's expert regarding future dangerousness. Specifically, Rivas argues that the State failed to satisfy the test for reliability of expert witness testimony set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Rivas acknowledges that this claim is squarely foreclosed by Supreme Court and circuit precedent. *See, e.g., Barefoot v. Estelle*, 463 U.S. 880, 896–906 (1983); *United States v. Fields*, 483 F.3d 313, 341–46 & n.28 (5th Cir. 2007). He maintains this claim to preserve the issue for further review. We deny a COA on this issue.

**E**

Next, Rivas contends that Texas's lethal injection protocol violates the Eighth Amendment's guarantees against cruel and unusual punishment. Rivas acknowledges that the lethal injection protocol upheld by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008), is substantially similar to that used in Texas, but persists in his claim. As in *Baze*, Rivas alleges a number of defects in Texas's current three-drug lethal injection protocol, but he fails to demonstrate that the State's lethal injection procedure creates a substantial risk of serious harm, nor has he offered an alternative drug protocol that would significantly reduce the risk, if any, of serious harm. *See id.* 553 U.S. at 49–52. Because reasonable debate on the district court's denial of this claim is foreclosed by Supreme Court and circuit precedent, *see Raby v. Livingston*, 600 F.3d 552 (5th Cir. 2010), we deny a COA on this issue.

**F**

In his sixth claim for relief, Rivas contends that his Sixth and Fourteenth Amendment rights were violated by the trial court's failure to instruct the jury on the burden of proof regarding the mitigating factors contained in the jury charge. Specifically, Rivas relies on *Ring v. Arizona*, 536 U.S. 584 (2002), and

*Apprendi v. New Jersey*, 530 U.S. 466 (2000), to argue that the State should bear the burden of proving beyond a reasonable doubt that there were not sufficient mitigating circumstances to warrant imposition of life imprisonment rather than the death penalty. But, as Rivas recognizes, this court has repeatedly rejected the argument that *Apprendi* and *Ring* require the state to prove beyond a reasonable doubt the absence of mitigating circumstances. *See Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007); *Granados v. Quarterman*, 455 F.3d 529, 536–37 (5th Cir. 2006); *Rowell v. Dretke*, 398 F.3d 370, 377–78 (5th Cir. 2005). Rivas concedes that this argument is squarely foreclosed by circuit precedent and he maintains it only to preserve the issue for further review. We deny a COA on this claim.

## G

In this claim, Rivas complains that his due process rights were violated by the trial court's instructions to the jury with special issues that contained allegedly vague and undefined terms. Specifically, Rivas complains of the trial court's failure to define the terms "probability," "criminal acts of violence," and "continuing threat to society," included in the first special issue submitted to the jury.[4] As with his previous claim, Rivas acknowledges that this claim is foreclosed by circuit precedent holding that these terms are not unconstitutionally vague and that their meanings may be readily understood. *See, e.g., Woods v. Johnson*, 75 F.3d 1017, 1033–34 (5th Cir. 1996); *James v. Collins*, 987 F.2d 1116, 1119–20 (5th Cir. 1993); *Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir. 1993). Rivas again maintains this argument to preserve the issue for further review. We deny a COA on this claim.

---

[4] Special Issue No. 1, as read to the jury, asked, "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, George Rivas, would commit criminal acts of violence that would constitute a continuing threat to society?" *See* TEX. CODE CRIM. PROC. ANN. art. 37.071 §§ 2(b)(1), (e)(1) (Vernon 1981 & Supp. 2005).

**H**

Rivas next contends that Texas's death penalty statute is unconstitutional because it does not require the trial court to instruct a capital jury on the consequences of its failure to agree on a punishment-phase special issue. Specifically, Rivas claims that TEX. CODE CRIM. PROC. ANN. art. 37.071, and the trial court's jury instructions given in conformity with that law,[5] violated his Eighth and Fourteenth Amendment rights because the court did not inform jurors that their failure to reach a unanimous verdict on punishment would result in Rivas receiving a sentence of life imprisonment. Rivas recognizes that this claim is expressly foreclosed by circuit precedent, *see Alexander v. Johnson*, 211 F.3d 895, 897 & n.5 (5th Cir. 2000), and it is foreclosed by Supreme Court precedent as well. *See Jones v. United States*, 527 U.S. 373, 381–82 (1999). We deny Rivas's request for a COA on this issue accordingly.

**I**

In his ninth claim for relief, Rivas contends that his due process rights were violated by the trial court's instruction to the jury that it was not to consider how long Rivas might serve in prison if sentenced to life. Rivas claims that the trial court's instructions violated his due process rights because jurors were told not to consider how long he might serve in prison if sentenced to life, even though they were informed that Rivas would be eligible for parole in forty years. Essentially, Rivas argues that *Simmons v. South Carolina*, 512 U.S. 154 (1994) (plurality opinion), requires trial courts to instruct capital juries on the actual duration of the defendant's incarceration because that time is necessarily relevant to a determination of future dangerousness. As the Supreme Court has explained, however, *Simmons* only applies to defendants who are ineligible for parole and, thus, is inapplicable here. *See Ramdass v. Angelone*, 530 U.S. 156, 166–69 (2000) (plurality opinion) (declining to extend *Simmons*'s rationale to

---

[5] *See id.* at §§ 2(d)(2), (f)(2) (Vernon 1981 & Supp. 2005).

cases, like Rivas's, in which the defendant would have been eligible for parole had he been given a life sentence).

Rivas recognizes that this claim is foreclosed by circuit precedent, *see Turner v. Quarterman*, 481 F.3d 292, 297 (5th Cir. 2007); *Thacker v. Dretke*, 396 F.3d 607, 616–17 & n.15 (5th Cir. 2005), but renews it to preserve the issue for further review. Because the district court's denial of this claim is not debatable among reasonable jurists, we deny a COA.

**J**

Finally, in his tenth claim for relief, Rivas contends that the standard of review set forth in 28 U.S.C. § 2254—requiring district courts to review the state courts' dispositions of claims under the "objectively reasonable" test—violates the Separation of Powers doctrine. In response, Respondent argues that this claim is not properly before the court, and is without merit in any event.

After the Texas Court of Criminal Appeals denied Rivas's state habeas application on February 15, 2006, *see Ex parte Rivas*, 2006 WL 367474 (Tex. Crim. App. Feb. 15, 2006) (per curiam), Rivas filed his federal habeas petition in the Northern District of Texas on February 13, 2007, within the one-year filing timeline imposed by 28 U.S.C. § 2244(d). Respondent filed an answer to Rivas's federal petition in November 2007.

On January 29, 2008, eleven months after filing his initial habeas application and without leave of court, Rivas filed a separate pleading in the district court entitled "Argument in Support of Petition for Writ of Habeas Corpus Asserting that 28 U.S.C. § 2254 Violates the Separation of Powers Doctrine." Respondent opposed this pleading, noting that Rivas's new claim for relief was not only unexhausted and procedurally defaulted, but time-barred as well. Respondent argued, as he does here, that Rivas's Separation of Powers claim was not properly before the district court. Alternatively, Respondent noted that the claim was foreclosed by Fifth Circuit precedent.

No. 10-70007

The magistrate judge opined that because Respondent had already answered Rivas's § 2254 petition, and because Rivas had not sought leave to amend as required by FED. R. CIV. P. 15, the court did not need to examine Rivas's new claim on the merits. Nonetheless, the magistrate judge did address the claim out of an abundance of caution, and found that it failed nonetheless. *See Rivas*, 2010 WL 1223130, at *17. The district court adopted the magistrate's findings and recommendations on this and all claims. *See Rivas*, 2010 WL 1223132, at *4.

We have already determined that AEDPA does not violate the Separation of Powers doctrine on several occasions. *See, e.g., Dufrene v. Brazoria Cnty. Dist. Attorney Office*, 146 F. App'x 715, 717 (5th Cir. 2005); *Hughes v. Johnson*, 191 F.3d 607, 612 (5th Cir. 1999); *Corwin v. Johnson*, 150 F.3d 467, 472 (5th Cir. 1998). Because reasonable jurists would not debate the lower court's decision to deny federal habeas relief on this claim, Rivas is not entitled to a COA.

## IV

Rivas has not made a substantial showing that his constitutional rights were denied. His request for a COA is DENIED accordingly.